

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FILED

DEC - 3 2010

CLERK, U.S. DISTRICT COURT
By _____
          Deputy

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

S.J.P.,                          §
                                 §
          Petitioner,            §
                                 §
VS.                              §   NO. 4:09-CV-112-A
                                 §
RICK THALER,[1] DIRECTOR,        §
TEXAS DEPARTMENT OF CRIMINAL     §
JUSTICE, CORRECTIONAL            §
INSTITUTIONS DIVISION,           §
                                 §
          Respondent.            §

MEMORANDUM OPINION
and
ORDER

After having considered the petition for writ of habeas corpus in behalf of a person in state custody filed by S.J.P. ("petitioner") pursuant to 28 U.S.C. § 2254, the court has concluded that the petition should be conditionally granted for the reasons set forth in this memorandum opinion.

CONTENTS

I.    Procedural Background . . . . . . . . . . . . . . . . 5

II.   State Court Proceedings Pertinent to Petitioner's
      Ineffective-Assistance-of-Counsel Claim . . . . . . . 8

---

[1] The petition by which this action was initiated named Nathaniel Quarterman ("Quarterman") as respondent. Effective July 15, 2009, Rick Thaler ("Thaler") succeeded Quarterman as Director of the Texas Department of Criminal Justice, Correctional Institutions Division. According to Rule 25(d) of the Federal Rules of Civil Procedure, Thaler is automatically substituted for Quarterman as a party.

A.  General Remarks . . . . . . . . . . . . . . . . . . .  8

B.  The Trial Evidence During the
    Guilt/Innocence Phase . . . . . . . . . . . . . . . .  9

    1.  A.P.'s Testimony . . . . . . . . . . . . . . .  10

    2.  S.P.'s Testimony . . . . . . . . . . . . . . .  16

    3.  Dr. Coffman's Testimony . . . . . . . . . . .  23

C.  Evidence Added to the Record at the State
    Habeas Stage  . . . . . . . . . . . . . . . . . . .  27

    1.  Affidavit Testimony Provided by
        Petitioner . . . . . . . . . . . . . . . . . .  27

        a.  Scott Bowles and Suzy Bowles . . . . . .  27

        b.  Carmelito Adolfo . . . . . . . . . . . .  29

        c.  Noemi Blanco . . . . . . . . . . . . . .  30

        d.  Ester Segundo . . . . . . . . . . . . . .  31

        e.  Mary Michael-Rogers, Jessica P.,
            Michael P., Tom Hudson, and
            Jennifer Biggs . . . . . . . . . . . . .  31

        f.  Dillon Ambrose . . . . . . . . . . . . .  32

        g.  Joann Murphey, Ph.D. . . . . . . . . . .  33

        h.  Donald Gandy . . . . . . . . . . . . . .  36

        2.    Affidavits of Petitioner's Trial Counsel
             Provided by State . . . . . . . . . . . . . . . 39

III. Findings Made and Conclusions Reached by the State
     Court With Respect to Petitioner's State Habeas
     Application . . . . . . . . . . . . . . . . . . . . . 42

IV. The Respects in Which Petitioner Claims the
    Performance of His Trial Counsel Was
    Constitutionally Deficient . . . . . . . . . . . . . . 44

    A.    Failure to Conduct an Adequate Investigation . . . 45

    B.    Failure to Use Character Witnesses at Trial . . . . 45

    C.    Introducing into the Trial Court Record
        A.P.'s Claim That Petitioner Sexually Abused
        S.P. When S.P. Was Twenty Months of Age . . . . . . 46

    D.    The Introduction by Defense Counsel of
        S.P.'s Letters and Journal, and Defense
        Counsel's Failure to Conduct Meaningful
        Questioning of the Witnesses Concerning
        Those Items . . . . . . . . . . . . . . . . . . . . 46

    E.    Allowing the Testimony of Dr. Coffman to Be
        Received into Evidence Without Objection . . . . . 47

    F.    Failure to Obtain Expert Assistance . . . . . . . . 47

    G.    Failure to Object Under Rule 404(b) to
        Evidence of Extraneous Offenses or Other
        Bad Acts of Petitioner . . . . . . . . . . . . . . 47

    H.    Referring to Petitioner as a Pedophile
        at the Punishment Phase, and Defense
        Counsel's Failure to Object at the
        Punishment Phase to the Testimony
        of the Probation Officer That
        Sex Offenders Cannot Be Cured . . . . . . . . . . . 48

V.   Conduct of Petitioner's Trial Counsel That Caused
     the Court to Have Sufficient Concern to Conduct
     a Hearing . . . . . . . . . . . . . . . . . . . . . 48

     A.   Trial Defense Counsel Opened the Door to
          Testimony from A.P. That She Saw Petitioner
          Molest S.P. When S.P. Was Twenty Months Old . . . . 49

     B.   Trial Counsel Failed to Object to Dr.
          Coffman's Testimony, and Solicited Testimony
          From Which the Jury Could Infer That She Was
          of the Opinion S.P. Had Been Sexually Abused  . . . 52

     C.   Failure of Defense Counsel to Seek Expert
          Assistance . . . . . . . . . . . . . . . . . . . 55

     D.   The Failures of Trial Counsel to Prove That
          Certain Testimony of A.P. and S.P. Was False
          Even Though the Proof Was Available . . . . . . . . 57

     E.   Failure of Trial Counsel to Investigate . . . . . . 59

     F.   The Introduction by Defense Counsel of S.P.'s
          Letters and Journal, and Defense Counsel's
          Failure to Meaningfully Conduct Cross-
          examination Relative to Those Items . . . . . . . . 59

VI.  The Hearing Conducted by This Court . . . . . . . . . 60

     A.   The Witnesses . . . . . . . . . . . . . . . . . 61

          1.   Blankenship's Testimony . . . . . . . . . . . 61

          2.   Miller's Testimony . . . . . . . . . . . . . 69

          3.   Gandy's Testimony . . . . . . . . . . . . . 73

     B.   Miller's File on Petitioner's Case . . . . . . . . 74

VII. Analysis . . . . . . . . . . . . . . . . . . . . . . 78

     A.   A Hearing on the Petition Was Appropriate . . . . . 78

4

B.   The Standards to Be Applied in Determining
     Whether Petitioner's Trial Counsel Was
     Constitutionally Deficient . . . . . . . . . . .   80

C.   The Assistance Miller and Blankenship
     Provided to Petitioner Was Constitutionally
     Ineffective . . . . . . . . . . . . . . . . . . .   82

     1.   Injection By Defense Counsel Before
          the Jury of the Allegation of
          Molestation in Hawaii . . . . . . . . . . .   83

     2.   The Handling of Dr. Coffman's Testimony . . .   84

     3.   Failure to Employ an Expert . . . . . . . . .   86

     4.   Failure to Investigate . . . . . . . . . . .   87

     5.   Failures of Trial Counsel to Discredit
          Certain Testimony of A.P. and S.P.
          Even Though Evidence Was Available
          to Do So . . . . . . . . . . . . . . . . . .   89

D.   Petitioner Has Overcome the Deference to
     Which the State Court's Adjudication and
     Determinations Were Entitled . . . . . . . . . .   93

VIII.  Conclusion . . . . . . . . . . . . . . . . . . .   95

IX.   Order . . . . . . . . . . . . . . . . . . . . . .   96

I.

Procedural Background

On November 13, 2003, petitioner was charged by indictment

filed in the 371st District Court of Tarrant County, Texas, with

four counts of aggravated sexual assault of a child under

fourteen years of age and one count of indecency with a child by

contact.  The alleged victim of each offense charged in the indictment was petitioner's daughter, S.P.

Petitioner pleaded not guilty.  On October 5, 2005, a jury returned verdicts finding him guilty of aggravated sexual assault of a child as charged in counts one and four of the indictment, not guilty of aggravated sexual assault of a child as charged in counts two and three, and guilty of indecency with a child by contact as charged in count five.[2]  The jury assessed punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for periods of forty years, fifty

---

[2]Each count of the indictment charged petitioner with committing a particular act on or about a particular date.  The relevant parts of the indictment are as follows:

> [S.J.P.] hereinafter called Defendant . . . on or about the 15th day of January 2001, did intentionally or knowingly cause the penetration of the female sexual organ of [S.P.] . . . by inserting his finger into her sexual organ.

> Count Two:    And it is further presented in and to said court that the defendant . . . on or about February 15, 2001, did intentionally or knowingly cause the sexual organ of [S.P.] . . . to contact the sexual organ of the defendant.

> Count Three:    And it is further presented in and to said court that the defendant . . . on or about May 1, 2001, did intentionally or knowingly cause the sexual organ of [S.P.] . . . to contact the mouth of the defendant.

> Count Four:    And it is further presented in and to said court that the defendant . . . on or about August 1, 2001, did then and there intentionally or knowingly cause the sexual organ of [S.P.] . . . to contact the sexual organ of the defendant.

> Count Five:    And it is further presented in and to said court that the defendant . . . on or about December 15, 2000, did then and there intentionally . . . engage in sexual contact by touching any part of the genitals of [S.P.] . . . .

Clerk's R. for Cause No. 0907043D at 2.

years, and fifteen years on counts one, four, and five, respectively, which the state trial court ordered to run concurrently.

Following his conviction, petitioner filed a motion for new trial, which was denied by operation of law when the state trial court failed to rule on it within seventy-five days after imposing petitioner's sentence. Petitioner appealed from the judgment against him to the Court of Appeals, Second District of Texas, at Fort Worth, which affirmed. His petition for discretionary review by the Court of Criminal Appeals of Texas was refused. The Court of Criminal Appeals denied his application for a state writ of habeas corpus.

Petitioner filed the petition initiating the instant action on February 19, 2009, asserting that his trial counsel, Martin Miller ("Miller") and Robert Blankenship ("Blankenship"), rendered ineffective assistance of counsel. On December 21, 2009, United States Magistrate Judge Charles Bleil issued his proposed findings, conclusions, and recommendation recommending that the petition be denied. Petitioner filed his objections to Judge Bleil's findings, conclusions, and recommendation on December 31, 2009.

After a complete review of the record of this action, including the state court records pertaining to petitioner's trial and state habeas application, the court determined that an evidentiary hearing should be held to allow petitioner to fully develop his claim that trial counsel rendered ineffective assistance of counsel.

An evidentiary hearing was held on July 20, 2010. The parties filed post-hearing briefs.

II.

State Court Proceedings Pertinent to<br>Petitioner's Ineffective-Assistance-of-Counsel Claim

A.   General Remarks

Because the court is required by 28 U.S.C. §§ 2254(d) and (e) to give deference to the state court's adjudication and determinations of issues pertinent to the adequacy-of-representation ground,[3] the court must consider the state court

---

[3]Title 28 U.S.C. §§ 2254(d) & (e)(1) read as follows:

    (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--

        (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(continued...)

proceedings, including the evidence received at petitioner's trial, the evidence received as a part of his state habeas action, and the state court's adjudication and determinations. Therefore, the court discusses those things in some detail[4] before proceeding to a discussion of the evidence received at the July 20, 2010, hearing and the impact that evidence has on the state court's adjudication and determinations.

B.    The Trial Evidence During the Guilt/Innocence Phase

The evidence presented by the prosecutor at trial in support of the charges against petitioner consisted of testimony of S.P.'s mother, A.P.; S.P.; and Jamye Coffman, M.D. ("Dr. Coffman"). Petitioner did not call a witness at the guilt/innocence phase of the trial. A summary of pertinent parts

---

[3](...continued)

        (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

        (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

[4]Necessarily the court has omitted some of the details given in the state court evidence. Nevertheless, all the evidence is being considered by the court in its analysis, findings, and conclusions.

of the witness testimony, and exhibits received as part of the testimony, follows:[5]

1.   A.P.'s Testimony

The prosecutor called as his first witness petitioner's ex-wife and S.P.'s mother, A.P. A.P., who was 40 years of age at the time of the trial, was born in the Philippines.  She met petitioner, who she said was "53 or 52 or something like that" at the time of his trial, in 1986 or 1987, while he was stationed in the Philippines with the Navy.  Trial Tr., Vol. 3 at 40.  They married in 1991 in Japan and had a daughter, S.P., in January 1992.  In December 1999, the family moved to Fort Worth.  A.P. did not work outside the home because of petitioner's insistence that she stay at home to watch S.P.  At the time of trial S.P. was in the eighth grade.  S.P. is a good student, who has been on the A/B honor roll.

On September 4, 2003, when S.P. was eleven years old, she told A.P. she had been raped, but did not say by whom.  S.P. then went to her bedroom and locked herself in.  That night A.P. thought about what to do.  The following night, September 5, A.P.

---

[5]The court is not discussing in this section all the testimony developed by petitioner's trial counsel on cross-examination, even though, as explained in later parts of this memorandum opinion, some of that testimony likely worked to petitioner's disadvantage.

related to petitioner what S.P. had told her, to which he
responded: "Don't listen to her. She is -- she is only making
things up and -- and only -- that's only her imagination. Don't
-- and it's late, and I need to go to bed. Go to bed." Id. at
23. A.P. went to the living room and cried because she realized
petitioner was not going to do anything about who raped their
daughter. At that time, A.P. had her suspicions that petitioner
was the one who raped S.P., but she also had her doubts.

At 2:00 a.m. September 9 or 10, 2003, A.P. called the police
because she "cannot stand it anymore." Id. at 24. Uniformed
officers came to their home. The officers did not speak to S.P.
because she was asleep. Someone, perhaps the police, gave A.P.
the phone number for Child Protective Services ("CPS"). Sometime
thereafter, A.P. called Lindsey Dula ("Dula") at CPS and related
to Dula what S.P. had told her. Around September 21, 2003, S.P.
told A.P. that petitioner was the one who raped her.[6] S.P. told

---

[6]The question and answer exchange between the prosecutor and A.P. starting at page 26 and
going through page 34 of the trial transcript is puzzling. As noted in the text, A.P. initially testified that
she first learned around September 21, 2003, that petitioner is the one who raped S.P. During the
question and answer exchange at page 26-34, the prosecutor inquired of A.P. how her September 21
conversation with S.P. came about, and A.P. responded by relating an event that occurred on August 28,
2003, when A.P. and petitioner were watching a news segment about child abuse. A.P. expressed
puzzlement over why people would abuse a little kid like that, to which petitioner responded, "[b]ecause
they have power." Trial Tr., Vol. 3 at 27. Then, as they were preparing for bed, she, from the bathroom,
heard petitioner talking out loud in the bedroom, saying "[w]hy did I do that to [S.P.]." Id. at 28. She
asked petitioner what he had done to S.P., and he told her that she was "hearing wrong." Id. That led to
(continued...)

A.P. that the rapes happened while A.P. was busy doing stuff, such as cooking, cleaning, showering, defecating, or playing games on the computer.

After S.P. told her what petitioner had done to her, she called the police and asked for a restraining order against petitioner to keep him from disturbing them, but he kept coming back. She did not say anything to petitioner about what S.P. said to her about petitioner's involvement.

Looking back, A.P. saw changes in S.P.'s behavior starting in 2000, which coincided with the time S.P. said petitioner was abusing her. S.P. was always mad at A.P. and would push A.P. away when A.P. tried to hug her. She thought S.P. was behaving the way she was "because of the TV." Id. at 38. In October 2001 A.P. heard S.P. crying in her bedroom. When A.P. asked S.P. why she was crying, S.P. denied that she was crying and tried to hide her tears. In December 2001 S.P. asked A.P. for a lock for her bedroom door. A.P. thought S.P. made that request because she started having her monthly period.

---

[6](...continued)
an argument between A.P. and petitioner. Id. at 28-29. She thought he was going to hit her, so she left the bedroom and went into the living room in the dark to decide what to do--she was upset and was crying. Id. at 29. She said that when she was in the living room crying she had already talked to S.P. about who raped her. No attempt was made to explain or exploit the apparent discrepancies in A.P.'s testimony.

A.P. also noticed changes in her relationship with petitioner during the time he was allegedly abusing S.P. They fought more during that time, usually about money. When they fought, petitioner would sometimes threaten to send A.P. back to the Philippines without S.P.

In October 2001 she saw bruises on S.P.'s body that caused her concern. When she questioned S.P. about the bruises, S.P. told her that she bumped into something. At the time A.P. thought S.P. was hiding something from her. She considered calling the police at that time. The bruises were on both of S.P.'s thighs. She told S.P. that the bruises did not look like she had bumped into something, but looked like a hand. Petitioner was present when she was talking to S.P. about the bruises, and he was looking at S.P. while the conversation was taking place, and S.P. was looking at him.

At the outset of cross-examination of A.P. by Miller, he developed that A.P. did not ask S.P. for any details as to what S.P. meant when she told A.P. on September 4, 2003, that she had been raped. A.P. said that petitioner moved out of the family's house on September 18, 2003. When S.P. told A.P. on September 21, 2003, that petitioner was her rapist, A.P. did not call the police or CPS immediately. When Miller asked if it was October

1, 2003, when A.P. first told CPS that S.P. had identified petitioner as her rapist, A.P. said that she did not know.  When asked why she was having difficulty remembering what happened on October 1, she testified that petitioner caused her a lot of pain and that she was confused about whether to believe her daughter or petitioner.

She recalled on cross-examination that on a Sunday, during December 2001, after petitioner had finished mowing the lawn and had taken a shower, and while A.P. was in the master bedroom and petitioner and S.P. were watching TV, she heard S.P. say "[d]addy, let's do it again on the floor."  Id. at 56-57.  A.P. said that she came from the bedroom to where petitioner and S.P. were, and asked what they were talking about.  Petitioner responded that she was hearing wrong, and that she must be hearing the TV.  A.P. explained, "I thought maybe that's the TV, so I stopped asking anything like that, and then I went back to the computer playing solitaire."  Id. at 57.

In the days immediately after September 4, 2003, when S.P. told A.P. that she had been raped, there was no family discussion concerning what S.P. told A.P.  Petitioner and A.P. did not ask S.P. anything like that.  Instead, they all just watched TV.

During Miller's cross-examination of A.P., he introduced a subject that the prosecutor had not mentioned during direct examination. Miller developed that A.P. claimed that she saw petitioner molest S.P. when S.P. was twenty months old. Id. at 55-56. When cross-examination was completed, the prosecutor obtained permission of the judge to ask A.P. more questions about that. On redirect examination, A.P. testified that she saw petitioner fondling his penis with one hand while touching S.P.'s vagina with the other. Id. at 65-66. When she saw that, she confronted petitioner and hit him with a book, and he promised that he would not do it again.

When A.P. was recalled by the prosecutor as a witness after S.P.'s testimony was concluded, A.P. identified a letter she had received from petitioner through the mail in late October 2003. She said the letter was an attempt by petitioner to get her and S.P. to change their story under threat that he would be seeking a divorce if they failed to do so. During this session of testimony, A.P. elaborated on the nature of her relationship with petitioner over the years. She said that during the year 2000 her sexual relationship with petitioner was not the way it was before. Before then they had sexual relations four to eight times each day when petitioner was not working, but when he was

working they only had sexual relations two times a day, nighttime and in the morning. Starting in the year 2001 they had sexual relations only on the weekends. Petitioner explained to her that he slowed down because he was getting old.

When Miller cross-examined A.P. on her second trip to the stand, he questioned her about the October 2003 letter the prosecutor had asked her about. A.P. characterized the letter as a request that she change her story and tell a lie. At the behest of Miller, the letter was received into evidence as Defendant's Exhibit 5. Miller then read the letter to the jury.

    2.  <u>S.P.'s Testimony</u>

S.P. described, in a general way, her daily routine and family life in 2000 and 2001. She left the house to go to school around 8:00 a.m. Petitioner left for work before she awakened. She returned from school around 3:00 p.m., and petitioner came home from his work for the Navy around 4:00 p.m. Her mother was not working outside their home. S.P. went to bed at 8:00 p.m. Her parents would go to bed around 10:00 p.m. or 11:00 p.m. She did not have friends in the neighborhood, and she spent most of her time with her mother, with whom she was very close. She did not spend a lot of time with petitioner and was not very close to him.

16

In November 2000, petitioner started touching S.P.  At first he touched her outside her pants, outside her vagina.  That happened in the living room, while S.P. and petitioner sat on the couch watching television and A.P. was in the shower.  S.P. did not tell anyone what happened because she believed petitioner when he told her that she would get in trouble and go to juvenile hall if she did.  The same kind of touching happened a lot while they were at the duplex where they were living when petitioner first touched her.  When the family moved to another residence, petitioner continued to touch her on the outside of her clothes, on the outside of her vagina.  When that touching happened, S.P. and petitioner were in the living room while A.P. was in the bedroom.

Beginning in around February 2001, petitioner began touching S.P. inside her clothes.  The touching lasted for five to ten minutes at a time and took place in the living room or in S.P.'s bedroom, while A.P. was cooking or cleaning or something like that.  S.P. felt "really weird" about what was happening but did not tell anyone because she was scared petitioner would hurt her or her mother.  Trial Tr., Vol. 3 at 87.

Petitioner began touching S.P. inside her vagina with his fingers.  When he did that, her clothes were off.  He would do

17

this in the living room after she got home from school or in her bathroom and, sometimes at night, in her bedroom, while A.P. was sleeping. She never told any of her girlfriends at school what was happening because she did not trust them.

In March or April 2001 petitioner started putting his tongue inside S.P.'s vagina. Petitioner did that to her every day. He would take her clothes off and do that to her on the floor in the living room or on her bed. While that was happening, A.P. was either taking a shower, cleaning, cooking, or something. A.P. played games on the computer for a couple of hours every night and was very focused on the computer.

Petitioner also put his penis inside S.P.'s vagina every day, either in the living room, dining room, her bedroom, or, once or twice, the master bedroom. S.P. thought petitioner's penis went all the way inside her vagina. Sometimes it hurt. Petitioner did not always use the same position. Sometimes he put S.P. on top of him, grabbed her hips, and moved her up and down. He only did it that way three or four times because he left noticeable scratch marks on S.P.'s hips. When they did that, she had part of her clothes off. She took them off when he told her to. Petitioner had his pants and underwear off when they did that. A.P. asked S.P. how she got the marks, and S.P.

told A.P. that she had fallen down.  Once when they were doing it
in the master bedroom she "peed on the bed" when petitioner put
his penis inside her vagina.  Id. at 95.  When that happened,
A.P. was in the kitchen cooking.  Petitioner explained the urine
on the bed by telling A.P. that the dog had done it.

Around Christmas in 2001 S.P. had a lock put on the door of
her bedroom to keep petitioner from getting in during the middle
of the night.  He had been coming into her room in the middle of
the night three or four times a week and, when he did, he would
put his penis inside her vagina.  To explain why she wanted a
lock, she told her mother that she did not trust the relatives
who would come to visit.

When petitioner first started touching S.P. through her
clothes while they lived in the duplex, she told him that she
should tell A.P. about what was happening.  He responded by
telling her that A.P. did not know the American way.

Petitioner stopped abusing S.P. in 2002 because S.P. started
hanging around her mother a lot.  S.P. went to the grocery store
with A.P. and sat in the bathroom and read while A.P. showered.
When petitioner asked S.P. why she was following her mother
around, S.P. told him she didn't want to be around him anymore,
which made him angry.

In September or November 2003, S.P. told A.P. she had been raped because she "couldn't take it anymore." Id. at 108. Later that month, S.P. told A.P. that it was petitioner who raped her. Initially she did not tell A.P. who raped her because she was still scared petitioner might do something bad to her or her family.

When S.P. told A.P. petitioner was the person who raped her, A.P. called the police, who, with Dula from CPS, came to the house and talked to her. Because she did not know what was going on, and was scared and confused, she told them that nothing had happened to her.[7] Sometime in October 2003 during S.P.'s third or fourth interview with Dula, S.P. told Dula that petitioner had touched her with his hands and tongue. She did not tell Dula about the intercourse because she was ashamed and does not like people judging her.

S.P. wrote a lot after she told her mother she had been raped. Writing relieved her stress. She wrote two or three letters about what happened to her and gave them to Dula. She

---

[7]At Trial Tr., Vol. 3 at 110-111, S.P. seems to give contradictory testimony, first indicating that she first talked to Dula when Dula and the police came to her house before giving a contradictory answer that she first talked to Dula when Dula showed up unannounced at her school. Whichever version of S.P.'s testimony on that subject is accepted, she consistently said that when she first talked to Dula she told Dula that nothing happened.

also wrote a journal. She wrote the letters and journal on her own.

On cross-examination by Miller, S.P. elaborated on some of the subjects discussed during her direct examination. When Dula first questioned S.P., Dula asked her if anyone had touched her inappropriately, anywhere on her private parts, and she told Dula that no one had done so. She denied during that first interview that she told her mother that she had been raped. Instead, she told Dula that her mother and dad fought a lot. She made the same denial to Dula when she visited with Dula again sometime in mid-September. She made the same denial to a police detective. She told them that her dad had never touched her and that no one else had touched her.

She said that during a videotaped interview she had with Dula on October 1, 2003, she responded to Dula's question asking her what happened to her by saying "it never happened more than five times," "twice when [she was] eight and three times when [she was] nine," and that "it never happened again." Trial Tr., Vol. 3 at 120-21. She told Dula during that interview that petitioner never performed oral sex on her, and that petitioner never inserted his penis in her vagina.

When S.P. went to see a doctor for an exam two weeks after that, she told the doctor that she had been raped, that petitioner put his penis in her vagina, and that he had put his finger inside her vagina. When she was again interviewed by Dula later that month, she told Dula that she and petitioner had sex just about every day from November 2000 to November 2001 on the living room floor while A.P. was in the shower or the kitchen or on the computer or in the garden.

S.P. testified that petitioner eventually put all four of his fingers in her vagina and that she thought he put his penis all the way in her vagina. She said that they had sex five times a day every day, both oral and vaginal. S.P. said that she did not tell Dula that petitioner had sex with her five times a day because she was scared. She said petitioner has not touched her since November 2001.

Other items of evidence introduced before the jury by Miller during cross-examination were letters and a journal S.P. wrote years after the fact setting forth her accusations against her father. Miller had S.P. identify the items, which he marked as Defendant's Exhibits 1-4, and then he offered them. After they were admitted, Miller went to other subjects, and then announced that he had no further questions of S.P. On redirect

examination, the prosecutor read to the jury parts of three of the exhibits, and then on re-cross Miller read extensively from the exhibits.  The contents of the exhibits that were read to the jury reiterated much of what S.P. had already said from the witness stand, thus giving emphasis to her version of events.

    3.   <u>Dr. Coffman's Testimony</u>

    Dr. Coffman is a pediatrician and the medical director of the CARE Team, a child abuse clinic housed out of Cook Children's Hospital in Fort Worth.  Children are usually referred to the CARE team by law enforcement, CPS, or a primary care provider or therapist.  When a child comes who may have been a victim of sexual abuse, Coffman first obtains the child's medical history. She then performs a head-to-toe exam, just like would occur at a regular doctor's visit.  Next, she conducts a detailed examination of the child's genitals and anal area using a piece of equipment called a colposcope, a microscope on wheels, with a light.  Finally, she reviews the results of the exam and any lab work with the child's caretaker and refers them to counseling. An exam lasts about an hour and a half.

    The witness drew a diagram of, and gave the jury something of a lecture on, the female genitalia.  She described how it changes as a child matures.  About eighty-five to ninety percent

of the exams conducted by the CARE team are normal. That is because the tissue inside the vagina heals quickly, without scarring, meaning that no evidence of trauma remains at the time of the exam.[8]

Dr. Coffman examined S.P. on October 15, 2003. She first obtained S.P.'s medical history. Next, she asked S.P. why she was there. S.P. told Dr. Coffman that the abuse started when she was eight years old, that it began with touches outside her vagina and progressed to touches inside her vagina, and that petitioner eventually put his finger and penis inside her vagina. S.P. said she wasn't sure if petitioner's penis went all the way inside her vagina. She said it hurt, but said that she did not bleed. S.P. made no mention of oral sex. She told Dr. Coffman that the abuse last happened when she was about nine, and that petitioner told her that she could get in trouble if she told.

After listening to S.P.'s narrative, Dr. Coffman performed a head-to-toe checkup. She examined S.P.'s anal area and genitals using the colposcope. She would not expect to see any evidence of trauma in S.P.'s case. First, when she examined S.P., the abuse had not occurred for almost two years. Second, S.P. may

---

[8]Interestingly, Dr. Coffman failed to mention the possibility that some percentage of the exams she conducted were normal because the child's accusations of abuse were not true.

have been within a few months of the beginning of her menstrual period when the abuse occurred, meaning that her body could have been producing estrogen, which causes the hymen and vagina to become stretchy and, therefore, more resistant to tearing.

S.P. responded to Dr. Coffman's questions with brief answers and minimal eye contact, which is not unusual.

Even though the prosecutor developed no testimony from Dr. Coffman as to what, if any, diagnosis she made, Blankenship on his cross-examination of Dr. Coffman developed testimony from which the jury could infer that Dr. Coffman made a diagnosis, based solely on history, that S.P. was sexually abused. The following exchanges occurred during cross-examination:

> Q:   Okay.  You put in your report here that this was normal but consistent with a history of sexual abuse. . . .
>
>       .   .   .   .
>
> A:      .  .  .  Yes.  .  .  .
>
> Q:   Okay.  Wouldn't it also be true to say that it's normal and consistent with no sexual abuse?
>
> A:   That's correct.
>
> Q:   Okay.  And so based on this, you have no way to say to a reasonable scientific certainty whether or not she was abused or not?

A:   Well, it's a medical exam, and so my medical diagnosis is based not only on physical exam but on history, just as if you came in with a headache.

. . . .

Q:   . . . Can you say to a medical certainty whether she was abused or not?

A:   My medical impression and diagnosis -- now -- so in my opinion -- I can give you my medical opinion.

Q:   But you can't say to a certainty?

A:   I'm not sure -- I'm not sure how to answer that.

Q:   That's -- that's all right.

Trial Tr., Vol. 3 at 197-99.

Blankenship then asked Dr. Coffman if she ever went through a rotation in psychiatric or mental health. She stated that her residency was exclusively in pediatrics, but that she did a rotation in mental health in medical school. While in that rotation, she encountered people who were schizophrenic and who had encountered head trauma, and it was not uncommon for those people to make outlandish claims. She had no experience with mental health patients making claims of sexual abuse, however.

C.    <u>Evidence Added to the Record at the State Habeas Stage</u>

    1.    <u>Affidavit Testimony Provided by Petitioner</u>

Petitioner supported his state court habeas application with the testimony of thirteen persons presented in affidavit form, the contents of which are summarized below:

    a.    <u>Scott Bowles and Suzy Bowles</u>

The Bowleses have known A.P. and S.P. for over ten years. They live in Fort Worth.  They socialized with petitioner and A.P. when all four of them lived in Japan.  While in Japan, A.P. accused petitioner of having an affair with a female co-worker, which the Bowleses knew was not true.  A.P. believed petitioner was having an affair with every woman he worked with.

A.P. told Ms. Bowles that she looked at the monitor during the examination of S.P.'s vaginal area and could tell immediately that S.P. was not a virgin and that she had been sexually abused. From her knowledge of the female anatomy, Ms. Bowles knew that A.P. was not telling the truth.  A.P. told the Bowleses that the medical exam proved that petitioner had sexually assaulted S.P.

They developed a concern that A.P. was mentally unstable when she told them a story, which she obviously believed, that an unknown man broke into their home at night and came into her bedroom and stood over her while she was in bed, staring at her.

There was no sign or evidence that such a thing ever occurred. After A.P. told them that S.P. had been molested, they encouraged her to have S.P. examined medically and to contact the police. Weeks passed before A.P. reported any molestation to police. It was after that when A.P. told them that the medical exam of S.P. proved that petitioner had sexually assaulted S.P. and provided evidence of petitioner's guilt.

By the time of petitioner's trial, the Bowleses were convinced that A.P. was mentally ill. A.P. told the Bowleses that she wrote letters to President Bush asking him to get her a job as a secretary and to let S.P. skip two grades in school. In addition, they saw A.P. exercise a lot of influence over S.P.; she would not let S.P. talk to or go anywhere with other people. They found S.P. to be a child with extremely poorly developed social skills, who rarely spoke, even when accompanied by her parents. They believe S.P. would do or say anything A.P. wanted her to do or say. They believe A.P. convinced S.P. to make the allegations against petitioner; and, they thought there was no way petitioner committed the acts of which he was accused.

A.P. had told Ms. Bowles that she had witnessed petitioner molesting S.P. in Japan, not Hawaii as she claimed during petitioner's trial. She did not know what to make of what A.P.

said happened in Japan because A.P. did not make any report to any authority, to her knowledge. The Bowleses gave other examples in their affidavits of conduct on the part of A.P. that would cause a person to conclude that A.P. was mentally ill.

Based on what they know of A.P. and S.P., they think A.P. and S.P. have poor character for truthfulness and are not worthy of belief under oath. They believe that A.P. convinced S.P. to make the allegations against petitioner and that the allegations are false.

Had they been contacted by petitioner's trial counsel they would have been able to assist in petitioner's defense.

### b.  Carmelito Adolfo

Mr. Adolfo resides in Cleburne, Texas. A.P. and S.P. lived at Mr. Adolfo's rental property in Cleburne in 2004 after A.P. and petitioner separated. Mr. Adolfo has learned that A.P. claimed he put goat feces in her cereal and that S.P. claimed he skinned their dog, treated A.P. like a slave, and destroyed their food. All of those allegations are false. He has also learned that A.P. claimed petitioner entered her bedroom at the rental property at night, kissed her, and then left. Such a thing would have been impossible because of the way he secures the property. On another occasion, A.P. called 911 because she thought she

heard someone walking on the porch of the rental property, and that the person she heard attempted to force his way into the front door. When the police responded, they found no sign of any prowler or any attempted entry.

Based on what he knows of A.P. and S.P., he thinks their character for truthfulness is poor and he would not believe them under oath. Had he been contacted by petitioner's trial counsel he could have assisted in petitioner's defense.

      c. <u>Noemi Blanco</u>

Ms. Blanco is the director of nurses at Town Hall Estates in Keene, Texas, where A.P. was employed as a dietary aide in 2003 and the first few months of 2004. The assistant director of nurses there was Star Adolfo. Ms. Adolfo helped A.P. get the job and offered them a place to live at Mr. and Mrs. Adolfo's home. While A.P. was living with the Adolfos, she made the false accusation that Mr. Adolfo was poisoning her food. A.P.'s employment at Town Hall Estates was ultimately terminated for failure to show up to work. Based on what she knows about A.P., she believes her reputation for truthfulness is poor and that she is not someone she would believe under oath.

    d.   <u>Ester Segundo</u>

Ms. Segundo was A.P.'s and S.P.'s neighbor when they lived at Mr. Adolfo's property. A.P. told Ms. Segundo lies and accused Mr. Adolfo of doing things he did not do. For example, A.P. told Ms. Segundo that Mr. Adolfo tried to kill her dog and to destroy or steal her food and that he poisoned her food, all of which accusations were false. She understands that in a journal S.P. says she wrote, which was entered into evidence at petitioner's trial, S.P. made certain statements about her and other persons at Town Hall Estates that were not true and did not make sense to her. Based on what she knows of A.P. and S.P., she thinks their character for truthfulness is poor and she would not believe them under oath.

    e.   <u>Mary Michael-Rogers, Jessica P.,</u>
          <u>Michael P., Tom Hudson, and Jennifer Biggs</u>

Ms. Michael-Rogers has known petitioner for twenty-nine years, two of which he lived with her and her then-husband in their home in Austin. Steven P. is petitioner's nephew. Michael P. is another of petitioner's nephews. Mr. Hudson is a life-long friend of petitioner. Ms. Biggs is petitioner's step-niece. All of these witnesses would have been available to testify, and

would have testified, favorably about petitioner's character if they had been called as witnesses at trial.

      f.   <u>Dillon Ambrose</u>

Dillon Ambrose is a lieutenant serving in the United States Navy Judge Advocate General office in Washington, D.C. Lieutenant Ambrose served as petitioner's defense counsel in military administrative proceedings initiated against him based on the allegations made by S.P. At the first level of the administrative proceedings, there was a finding that there was sufficient evidence to demonstrate that petitioner had engaged in the conducted ascribed to him by S.P. On appeal, in which Lieutenant Ambrose represented petitioner, the Appellate Board ruled that that ruling was in error. Among the documents that were presented to the Board were the results of a polygraph examination that petitioner passed with flying colors. Lieutenant Ambrose also was able to present to the Board information establishing that A.P. had falsely believed in the past that petitioner was having an affair with a female associate in the Navy. The female associate provided email evidence that she was threatened several times by A.P. over the relationship A.P. imagined that petitioner was having with her.

Lieutenant Ambrose provided the information he had to petitioner's criminal defense counsel in the spring of 2004, and met with the defense counsel for the purpose of providing them an outline of information/inconsistencies that Lieutenant Ambrose had noted from his review of all of the records regarding the allegations against petitioner. Other than that one meeting, and the memorandum he provided, he does not recall ever receiving any telephone calls or written correspondence from petitioner's trial defense counsel making any requests of Lieutenant Ambrose for anything. He would have assisted the trial defense counsel, with petitioner's consent and approval of his superiors, if he had been requested to do so. No such request was made.

g.  <u>Joann Murphey, Ph.D.</u>

Dr. Murphey is a forensic psychologist. At the request of petitioner's habeas counsel, she had reviewed court transcripts, records, journal and diary entries, letters, and a forensic child videotaped interview conducted in connection with petitioner's criminal case. Dr. Murphey is aware of the charges that were made against petitioner, his conviction, and the sentence imposed on him. She provided in her affidavit her thoughts and concerns on certain topics growing from her review of the material she described.

She questioned the integrity of the videotaped interview
Dula conducted of S.P. She thought the techniques used by Dula
put words into S.P.'s mouth. She noticed that S.P. used adult
terms, such as "rape," in the interview, which would be unusual
for a child her age. She considered very unusual that a child
would tell her mother about sexual abuse without, at the same
time, naming the perpetrator.

Dr. Murphey discussed the letters and journal S.P. had
written, which were offered into evidence at the trial. Also,
she discussed S.P.'s testimony at the trial. She particularly
noted that when S.P. was first interviewed by Dula, S.P. denied
any form of sexual abuse, and that she did not tell Dula that she
had been sexually abused until after three or four interviews,
when she changed her statements. Dr. Murphey thought significant
that S.P. even denied to Dula that she told her mother that she
had been raped, which, Dr. Murphey thought, cast doubt on her
mother's statement to the police regarding S.P.'s accusation.
Dr. Murphey said that the assertions by S.P. that she and her
father had sex daily, five times a day, all while her mother was
at home, did not make sense and bordered on sounding delusional.
And, she thought significant that S.P. did not relate that
information to Dula, thus, apparently, concealing from Dula a

version that would cause Dula to realize how incredible S.P.'s accusations were.

Dr. Murphey critiqued at length the testimony A.P. gave at trial. She expressed concern about A.P.'s mental status. Dr. Murphey said that A.P.'s testimony suggested that she had significant psychological issues, noting that even when A.P. understood the questions that were put to her, her testimony was often incoherent.

Dr. Murphey expressed the opinion that it is highly possible that S.P.'s accusations are a part of, or a result of, persecution by A.P. against petitioner that involves implausible and possibly delusional elements. S.P. seems to have been made a part of A.P.'s persecution of petitioner by choosing a side in the conflict between her parents. Dr. Murphey concluded that S.P.'s "allegations facially appear to be so outrageous, and the logistics of the alleged events so questionable, that it is highly possible in [Dr. Murphey's] opinion that [petitioner] is innocent of the crime or crimes with which he was charged as a result of [S.P.'s] statements." State Habeas R. at 77.

Dr. Murphey says that "[a] forensic psychologist should have been utilized by the defense in preparation for trial, and at trial, to undercut the testimony of the complainant and the

complainant's mother and to point out the deficiencies of the interview conducted in this case by the CPS." Id. Had she been contacted by petitioner's defense counsel, she would have been able to assist them in the defense of petitioner. She would have been able to testify in the case if she had been contacted, and would have testified favorably to petitioner based on the information she has reviewed.

      h.    <u>Donald Gandy</u>

Mr. Gandy served as petitioner's appellate counsel in his state court appeal. He summarized in his affidavit what he, from his review and recollection of the record as petitioner's appellate counsel, saw that constituted ineffective assistance of counsel.

Mr. Gandy had concern that often evidence was received at trial without objection that would have been objectionable under Rule 404(b) of the Texas Rules of Evidence. Indeed, much of the objectionable evidence was introduced into the case by petitioner's own counsel. Examples Mr. Gandy gave were A.P. having to obtain a restraining order against petitioner; petitioner breaking the restraining order; petitioner committing adultery during his marriage to A.P.; petitioner throwing the family dog out the door; petitioner poisoning A.P. on multiple

occasions; petitioner yelling a lot, having a hot temper, and lying a lot to A.P.; and, A.P.'s claim that petitioner fondled the genitals of S.P. while she was twenty months old while masturbating himself.

Mr. Gandy was particularly concerned with the number of times the questioning by defense counsel brought out information adverse to petitioner that should not have been injected into the case. Of particular concern to Mr. Gandy was the conduct of defense counsel in injecting into the case the allegation of sexual molestation by petitioner of S.P. when S.P. was twenty months of age. Also of concern to Mr. Gandy was the entry into the record by defense counsel of the letters and journals written by S.P. that reiterated in great detail the testimony S.P. already had given against petitioner. He also expressed concern as to the quality of the cross-examination, particularly the lack of penetrating questions concerning what, if any, suggestions S.P. received relative to the writing of the letters and journals.

Also criticized by Mr. Gandy was the failure during the punishment phase of the trial of petitioner's trial counsel to object to certain questions put by the prosecutor to a probation officer who had been called as a defense witness. In particular,

Mr. Gandy criticized defense counsel's failure to object to the probation officer's testimony that sex offenders cannot be cured even though there was no showing that the probation officer had qualifications to render such an opinion. Mr. Gandy noted that the prosecutor took advantage of the probation officer's testimony by using it in jury argument. Also drawing criticism from Mr. Gandy was defense counsel's reference to their own client during jury argument as a pedophile, which was the first time that term had been used throughout the trial.

The subject of available character witnesses that were not called by defense counsel was mentioned by Mr. Gandy in his affidavit. He was aware of many such witnesses that would have been available but who were not called. He expressed the opinion that the failure to call such witnesses was deficient. Mr. Gandy concluded his affidavit with the following strong criticism of petitioner's trial counsel:

> Any one of these errors standing alone constitutes ineffective assistance at trial. Trial defense counsel's performance was deficient. This deficient performance prejudiced the defense since there is a reasonable probability that but for counsel's omissions, the outcome of the proceeding would have been different. This reasonable probability is a probability sufficient to undermine confidence in the

outcome of the trial.  This constituted ineffective assistance of counsel.

State Habeas R. at 33.

2.  Affidavits of Petitioner's Trial Counsel Provided by State

As part of its response to petitioner's state court application and supporting affidavits, the State provided affidavits of Miller and Blankenship.  So far as the court can determine, the affidavits are identical except for the differences in the names of the affiants.

Miller and Blankenship explained that their overall trial strategy was to "let EVERYTHING in and play 'The Boy Who Cried Wolf' hoping that the jury would get fatigued with all the accusations" and that "the jury would think [A.P.] was suffering from mental problems either psychiatric or physical . . . , she used [petitioner] to get her American citizenship, and that this was a divorce gone 'nuclear.'"  Second Supplemental State Habeas R. at 11.  They "believed the jury would conclude that [S.P.] was being manipulated by [A.P.] and not believe her accusations." The attorneys explained that their strategy was one of last resort.  They had planned to use petitioner as a witness, but that plan was frustrated when petitioner was arrested about a month after they started representing him for possession of child

pornography. When that happened, their goal was to keep the
child pornography facts away from the jury at all costs, which
meant that they could not run the risk of using petitioner as a
witness. As to petitioner's complaint that they failed to
conduct an adequate investigation, for the most part their
response was that petitioner provided them a limited list of
possible witnesses to use at this trial, and that the list he
provided did not have on it the persons who provided the
affidavits petitioner used in support of his state habeas
application. They were aware of Lieutenant Ambrose, with whom
they met and from whom they acquired investigative materials he
had.

The attorneys said that they were reluctant to call
character witnesses during the guilt/innocence part of the trial
because of the risk that the prosecutor would be permitted to
cross-examine the character witnesses on the subject of
petitioner's possession of child pornography if they were to do
so, and would, as well, open the door for cross-examination of
any other conduct that might be viewed to be a bad act or
evidence of bad moral character on the part of petitioner.

In response to the complaint that they sponsored evidence before the jury that was damaging to petitioner, the attorneys explained:

> The claims made by [A.P.] and [S.P.] were so outrageous and so numerous as to not be believable, that no reasonable person would believe them. By sponsoring this evidence we were able to establish, or we were attempting to establish for the jury that neither [A.P.] nor [S.P.] should be believed.

Id. at 17.[9] This explanation was extended by the attorneys to cover their introduction of evidence that petitioner had committed adultery, tried to poison A.P. every time he gave her coffee, threatened to kill S.P.'s dog, molested S.P. when she was a toddler, and violated the restraining order, and that A.P. made unsubstantiated claims about a man pushing on her door while she and S.P. were living in Cleburne.

The only explanation the attorneys gave for their unusual handling of Dr. Coffman as a witness was that, during Blankenship's cross-examination of Dr. Coffman, they "were able to establish or attempted to establish the types of claims made were consistent with someone suffering from mental or psychiatric

---

[9]The language quoted in the text was repeated verbatim several times in each of the affidavits. Similarly, other explanations were repeated time and time again. If the repetitious language were to be removed from the affidavits, each of them probably would be reduced in length from thirteen pages to three or four pages.

41

illness."  <u>Id.</u> at 17, ¶ 3.1; 17-18, ¶ 3.2; 18, ¶ 3.4; 19, ¶¶ 3.5
& 3.6; 10, ¶¶ 3.7 & 4.1; 21, ¶ 5; 22, ¶ 6.

III.

<u>Findings Made and Conclusions Reached by the State Court<br>With Respect to Petitioner's State Habeas Application</u>

Petitioner's state court application for writ of habeas
corpus made the same allegations of ineffective assistance of
counsel as the instant petition.  On October 23, 2008, the State
filed its Proposed Memorandum, Findings of Fact and Conclusions
of Law for possible adoption by the state court.  The proposals
included the following:

> 3.  The two-prong test enunciated in *Strickland v.*
>     *Washington* applies to ineffective assistance of
>     counsel claims in non-capital cases.  *Hernandez v.*
>     *State*, 988 S.W.2d 770, 771 (Tex. Crim. App. 1999).
>     To prevail on his claim of ineffective assistance
>     of counsel, the applicant must show counsel's
>     representation fell below an objective standard of
>     reasonableness, and there is a reasonable
>     probability the results of the proceedings would
>     have been different in the absence of counsel's
>     unprofessional errors.  *Strickland v. Washington*,
>     466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674
>     (1984).

> .  .  .  .

> 13. Applicant has failed to prove that counsel failed
>     to investigate.

> .  .  .  .

18. Counsel's decision to allow the jury to see all of
    the victim's and her mother's claims in hopes the
    jury would conclude that the claims were too
    outrageous and too numerous to be true was based
    on reasonable trial strategy.

19. Counsel's decision to cross-examine Dr. Coffman on
    the fact that her decision that the victim was
    telling the truth was not based on any scientific
    or medical evidence instead of objecting to Dr.
    Coffman's diagnosis was the product of reasonable
    trial strategy.

    .  .  .  .

25. Counsel's decision to not use impeachment
    witnesses during the guilt/innocence phase of
    trial to attack the credibility of the victim and
    the victim's mother was the result of reasonable
    trial strategy because the court may have allowed
    evidence of the child pornography allegations to
    rebut the defense that the victim and her mother
    were not truthful.

    .  .  .  .

28. Counsel's decision to not use expert testimony to
    impeach the victim and the victim's mother was the
    result of reasonable trial strategy because the
    court may have allowed evidence of the child
    pornography allegations to rebut the defense that
    the victim and her mother were not truthful.

    .  .  .  .

30. Counsel's tactical decision to not object and
    allow all of the victim's and victim's mother's
    claims against Applicant and others was the result
    of reasonable trial strategy.

    .  .  .  .

34.  Applicant has failed to prove that his attorney's
     representation fell below an objective standard of
     reasonableness.

     . . . .

37.  Applicant has failed to show that there is a
     reasonable probability that, but for the alleged
     acts of misconduct, the result of the proceeding
     would be different.

38.  Applicant received effective assistance of
     counsel.

Second Supplemental State Habeas R. at 43-46.

By order signed November 13, 2008, the state trial court

adopted the State's Proposed Memorandum, Findings of Fact and

Conclusions of Law as its own and recommended to the Court of

Criminal Appeals of Texas that the relief requested by the

application be denied.  The Court of Criminal Appeals of Texas

denied the application "WITHOUT WRITTEN ORDER ON FINDINGS OF THE

TRIAL COURT WITHOUT HEARING" on December 17, 2008.  State Habeas

R. at 2d page (unnumbered behind cover sheet).

IV.

The Respects in Which Petitioner Claims
the Performance of His Trial Counsel Was
Constitutionally Deficient

Stated somewhat generally, the complaints petitioner had at

the state habeas stage, and still has, with the conduct of his

trial counsel are as follows:

A.   <u>Failure to Conduct an Adequate Investigation</u>

Petitioner complains trial counsel failed to conduct an adequate investigation, giving in his petition many examples of testimony that could have been obtained from witnesses who would have been identified and located if adequate investigation had been conducted that would have been favorable to petitioner's defense.   In support of his failure-to-investigate complaint, petitioner relies heavily on the affidavit testimony he provided in support of his state habeas petition.

Emphasis is placed by petitioner on the fact that in many instances A.P. and S.P. gave testimony adverse to petitioner that could have been rebutted but was not because of the failure of defense counsel to locate and to bring forward witnesses who could do so.   He also complained of instances when his counsel received denials from A.P. or S.P. when asked about unusual things they had said or done, but counsel did not follow up with evidence rebutting those denials even though the evidence was available, and would have been located by defense counsel if they had conducted an appropriate investigation.

B.   <u>Failure to Use Character Witnesses at Trial</u>

In a similar vein, petitioner complains of defense counsel's failure to use character witnesses at trial.   Again, petitioner

relies on the testimony as to his good character and testimony of the poor character for truthfulness of A.P. and S.P. contained in the affidavits he submitted in support of his state habeas application.

C.  Introducing into the Trial Court Record A.P.'s Claim That Petitioner Sexually Abused S.P. When S.P. Was Twenty Months of Age

This claim is self-explanatory from the summary of testimony given first at the behest of petitioner's counsel and then expanded upon in redirect examination by the prosecutor. See supra at 15.

D.  The Introduction by Defense Counsel of S.P.'s Letters and Journal, and Defense Counsel's Failure to Conduct Meaningful Questioning of the Witnesses Concerning Those Items

As previously noted in the summary of trial testimony, defense counsel, apparently in furtherance of their goal of emphasizing the absurdity of the allegations being made against petitioner, put into evidence highly inflammatory writings S.P. prepared long after the events of which petitioner was accused. Petitioner criticizes his counsel for doing that, and also criticizes them for not asking meaningful questions of A.P. or S.P. concerning how the writings came about or concerning inconsistencies in the writings and the trial testimony.

E.  <u>Allowing the Testimony of Dr. Coffman to Be Received into Evidence Without Objection</u>

Petitioner notes that his trial counsel made no objection to any part of Dr. Coffman's testimony, failed to file any pretrial motion in an attempt to prevent or limit her testimony, and failed to conduct any voir dire examination in an attempt to prevent or limit the testimony.  He complains that the testimony that S.P. had a normal examination served no purpose other than to implicitly support the case against petitioner because Dr. Coffman was permitted to repeat S.P.'s accusations against petitioner and, at defense counsel's behest, to imply that she had an opinion that S.P. had been sexually molested.

F.  <u>Failure to Obtain Expert Assistance</u>

In reliance on Dr. Murphey's affidavit testimony, petitioner urges that his trial counsel should have obtained the assistance of someone with qualifications comparable to Dr. Murphey's to assist them in trial preparation and at trial on the subjects mentioned by Dr. Murphey in her affidavit.

G.  <u>Failure to Object Under Rule 404(b) to Evidence of Extraneous Offenses or Other Bad Acts of Petitioner</u>

The complaints made under this heading in the petition overlap some of the other complaints.  Petitioner is concerned that his trial counsel did not object to testimony to the effect

that he was a womanizer, had committed adultery, had tried to poison his wife, had been subjected to a restraining order, and had violated the restraining order.

H.    Referring to Petitioner as a Pedophile at the Punishment Phase, and Defense Counsel's Failure to Object at the Punishment Phase to the Testimony of the Probation Officer That Sex Offenders Cannot Be Cured

These contentions of petitioner are not related to the guilt/innocence phase of his trial, but bear only on the punishment phase.  Because, in order to resolve this case in favor of petitioner, the court does not need to decide, and has not decided, whether the representation Miller and Blankenship provided petitioner at the punishment phase was constitutionally deficient, the court is not discussing that phase of the trial further in this memorandum opinion.

V.

Conduct of Petitioner's Trial Counsel That Caused the Court to Have Sufficient Concern to Conduct a Hearing

If, in fact, a part of the trial strategy of petitioner's trial counsel was to emphasize to the jury that the allegations of A.P. and S.P. against petitioner were too numerous and outrageous to be true, such a strategy would not be an unreasonable one.  The court is concerned, however, that the

48

manner in which that strategy was carried out was not reasonable. In particular, the court's decision to order a hearing resulted from concerns the court developed from a review of the state court trial and habeas records that the conduct of petitioner's trial counsel about which petitioner complains was constitutionally deficient in the following respects:

A.  Trial Defense Counsel Opened the Door to Testimony from A.P. That She Saw Petitioner Molest S.P. When S.P. Was Twenty Months Old

During his cross-examination of A.P., Miller introduced the following subject into the record for the first time:

> Q:  Did you make a statement to anyone that in 1993, when [S.P.] was 20 months old, that he was molesting her in Hawaii?
>
> A:  No, I did not make a report on that.
>
> . . . .
>
> Q:  Did you see that?
>
> A:  I see -- I was sick.
>
> . . . .
>
> Q:  So did you make an allegation that he abused her when she was 20 months old or not?
>
> A:  I see him touching. I told him to go check on [S.P.], but he takes so much time. He spend so much time there in her room. And then I was wondering why he was so long over there, and then I go look, and that's what I see.